United States District Court
Southern District of Texas

**ENTERED**

March 29, 2021
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

OPPORTUNE LLP,                              §
                                           §
        Plaintiff,                         §
                                           §
v.                                         §        CIVIL ACTION NO. H-18-0007
                                           §
OPORTUN, INC. and                          §
OPORTUN, LLC,                              §
                                           §
        Defendants.                        §

MEMORANDUM AND ORDER

Pending is Defendants' Motion to Exclude Opinions and Testimony of Ambreen Salters, Ph.D. and Jason McDonald, Ph.D. (Document No. 106). Plaintiff retained Salters and McDonald to offer expert opinions on the issues of damages and digital marketing and advertising, respectively. Defendants do not dispute Salters's and McDonald's qualifications, but they argue that the experts' opinions should be excluded as irrelevant, unreliable, and not based on sufficient facts or damages.

I. Timeliness

Plaintiff argues that Defendants' motion to exclude, filed on March 16, 2020, should be denied as untimely.[1] The last scheduling order to include a deadline for non-dispositive motions, entered in

_____

[1] Document No. 113 at 1-2.

2018, required such motions to be filed by May 31, 2019.[2]  All subsequent amendments to that scheduling order were approved on forms submitted by the parties and they omitted any reference to non-dispositive motions.  *Both parties*, however, have filed non-dispositive motions after the May 2019 deadline without any challenge to their timeliness, and the Court ruled on those motions.[3]  As it happens, the COVID-19 pandemic has caused a cessation of jury trials and multiple delays of all sorts of deadlines.  Plaintiff has shown no prejudice to itself by allowing the same deadline leniency for Defendants' present motion, which was filed more than a year ago.  Plaintiff's motion to exclude based on untimeliness is therefore denied.  This is where it stops: No further dispositive or non-dispositive motions will be permitted without movant having obtained in advance express leave of Court.

## II. Legal Standard

The admissibility of expert testimony is governed by FED. R. EVID. 702, which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise, if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based

---

[2] Document No. 42.

[3] *E.g.*, Document Nos. 62, 63, 64.

2

> on sufficient facts or data; (c) the testimony is the
> product of reliable principles and methods; and (d) the
> expert has reliably applied the principles and methods to
> the facts of the case.

Rule 702 and the principles announced in <u>Daubert v. Merrell Dow</u> <u>Pharmaceuticals, Inc.</u>, 113 S. Ct. 2786 (1993), apply to technical or specialized expert testimony. *See* <u>Kumho Tire Co., Ltd. v.</u> <u>Carmichael</u>, 119 S. Ct. 1167, 1171 (1999); <u>Black v. Food Lion, Inc.</u>, 171 F.3d 308, 310 (5th Cir. 1999).

The district court has a "gatekeeping" role when determining the admissibility of expert testimony. <u>Seatrax, Inc. v. Sonbeck</u> <u>Int'l, Inc.</u>, 200 F.3d 358, 371-72 (5th Cir. 2000). The court must determine whether an expert is qualified and whether the expert's testimony is reliable and relevant. The purpose is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." <u>Kumho Tire</u>, 119 S. Ct. at 1176. The <u>Daubert</u> inquiry is always fact-specific. <u>Black</u>, 171 F.3d at 311.

Whether an expert is qualified depends on if the witness has "such knowledge or experience in [his] field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth." <u>United States v. Hicks</u>, 389 F.3d 514, 524 (5th Cir. 2004) (quoting <u>United States v. Bourgeois</u>, 950 F.2d

3

980, 987 (5th Cir. 1992)).  An expert's testimony does not always have to be based on scientific testing; it can be based on personal experience.  *See* <u>Kumho Tire</u>, 119 S. Ct. at 1175-76.  However, an expert's self-proclaimed accuracy is insufficient.  *See* <u>Gen. Elec. Co. v. Joiner</u>, 118 S. Ct. 512, 519 (1997) ("[N]othing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); <u>Moore v. Ashland Chem. Inc.</u>, 151 F.3d 269, 276 (5th Cir. 1998) (en banc).  Whether an expert's testimony is reliable requires "an assessment of whether the reasoning or methodology underlying the testimony is scientifically valid."  <u>Curtis v. M&S Petroleum, Inc.</u>, 174 F.3d 661, 668 (5th Cir. 1999).

The burden is on the party offering the expert testimony to "prove by a preponderance of the evidence that the testimony is reliable."  <u>Moore</u>, 151 F.3d at 276; *see also* <u>Daubert</u>, 113 S. Ct. at 2796 n.10 (under FED. R. EVID. 104(a), the proponent of expert testimony must establish the witness's qualifications by a preponderance of proof).  However, the party offering the challenged expert opinions "need not prove to the judge that the expert's testimony is correct."  <u>Moore</u>, 151 F.3d at 276.  The focus of the inquiry is not upon the substance of ultimate conclusions reached, but instead upon the "principles and methodology" used to reach those conclusions.  <u>Daubert</u>, 113 S. Ct. at 2797.

4

## III. <u>Discussion</u>

A. <u>Opinions of Ambreen Salters</u>

Salters in her expert report discusses three types of damages potentially available to Plaintiff: disgorgement of profits, royalties, and statutory damages for violation of the Anti-Cybersquatting Consumer Protection Act ("ACPA").[4] Defendants move to exclude Salters's opinions and statements as to all three. Defendants do not contend that Salters--who has a Master of Science Degree in Economics, a Bachelor of Business Administration Degree with a double major in Finance and Economics, and more than 20 years of experience as an economics expert and consultant on licensing, transaction, and litigation projects--is unqualified to offer her opinions, but they challenge various aspects of her methodology.[5]

1. Disgorgement of Profits

Both the Lanham Act and the Texas Business and Commerce Code permit a trademark owner to recover an infringer's profits under appropriate circumstances. 15 U.S.C. § 1117(a); TEX. BUS. & COM. CODE § 16.104(b)(1). Salters uses industry reviews of hundreds of

---

[4] Document No. 107, ex. 1.

[5] <u>Id.</u>, ex. 1 ¶¶ 2-3. Defendants mistakenly refer to her as "Ambreen Salters, Ph.D." Salters does not claim to have a doctoral degree.

transactions to opine that approximately $33 million of Defendants' profits in the relevant years were "reasonably allocable to the trademark" and that, after deducting certain direct expenses, disgorgement of approximately $30 million of Defendants' profit is warranted.[6] Defendants argue that this testimony is unreliable and not based on sufficient facts and data because (1) Salters impermissibly used Defendants' revenues in all states rather than only in Texas, where the parties' businesses overlap and (2) Salters relies on studies analyzing other companies rather than Defendants' specific business and mark.[7]

The sole authority on which Defendants rely is an unpublished Fifth Circuit decision that found no reversible error in a district judge's modest damages award based on limiting the plaintiff's damages to lost profits on sales to customers of *both* the plaintiff and the defendant. *See* <u>Blendco, Inc. v. Conagra Foods, Inc.</u>, 132 F. App'x 520, 523 (5th Cir. 2005). In dicta the court reasoned in part that the plaintiff's "product was limited geographically to only seven states, while [the defendant] had marketed its product nationwide and had much larger sales. Allowing damages measured by all of the defendant's profits or sales would have granted a windfall to [the plaintiff] that we do not see as mandated by law or essential to principles of equity in these circumstances." <u>Id.</u>

---

[6] <u>Id.</u>, ex. 1 ¶¶ 27-31.

[7] Document No. 106 at 16-17.

6

There was no holding in <u>Blendco</u>, however, that proof of the defendant's profits was inadmissible or an improper consideration for a qualified opinion expert. Here, the geographic scope of the parties' usages is a disputed fact, and the burden of showing that their full profits should not be used rests on Defendants. *See* 15 U.S.C. § 1117(a) ("In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."). Salters's opinions based on her extensive experience and her reliance on national studies appears to be sufficiently reliable and relevant to be heard by the jury. Defendants' arguments go to the weight, not the admissibility, of the anticipated testimony and thus may be adequately addressed at trial through cross-examination. *See* <u>Daubert</u>, 113 S. Ct. at 2798 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); <u>Viterbo v. Dow Chem. Co.</u>, 826 F.2d 420, 422 (5th Cir. 1987) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.").

2.   Reasonable Royalties

"While not explicitly provided for in the Lanham Act, [the Fifth Circuit has] permitted trademark infringement damages on the basis of the royalty rate normally charged for licensing the unauthorized use of the mark, on the logic that the plaintiff sustained damages equal to the profit they could have made from such a license." Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc., 851 F.3d 440, 459 (5th Cir. 2017).   Salters calculated a reasonable royalty of $16 million by constructing a hypothetical license negotiation between the parties after considering the rates in a database of third-party trademark licenses, an agreement between Defendants and a bank in Montana, and a trademark license agreement Plaintiff entered with a subsidiary in 2010.[8]

Defendants argue that Salters's royalty opinion should be excluded because (1) Salters did not base her analysis on any significantly comparable licensing agreement, (2) her opinion is not rationally related to the scope of Defendants' infringement, (3) her opinion is not based on the 15 Georgia Pacific factors used to determine a reasonable royalty rate, (4) she applies her royalty rate to all of Defendants' revenues rather than only to those that

---

[8] Document No. 107 ¶¶ 32–41.

8

are rationally related to infringement, and (5) Salters never attempted to quantify Plaintiff's actual damages.[9]

Salters in her expert report acknowledges and accounts for factual differences between the license transactions she reviewed and the hypothetical license agreement she presents together with her opinion of a reasonable royalty rate. Defendants' first objection depends on their disagreement with Salters's analysis of the extent and importance of these factual differences and with her conclusion that Plaintiff's prior transaction used an arm's length royalty rate even though it was with a related company. Although framed as a challenge to Salters's methodology, Defendants do not dispute that considering comparable license transactions is an appropriate method for calculating a reasonable royalty. See Daubert, 113 S. Ct. at 2797 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."). Nor, as Defendants contend, did Salters merely parrot Plaintiff's positions without conducting her own analysis. Cf. MGM Well Servs., Inc. v. Mega Lift Sys., LLC, No. CIV.A. H-05-1634, 2007 WL 150606, at *4 (S.D. Tex. Jan. 16, 2007) (excluding testimony where expert "did not perform his own calculations, but opined that MGM's calculations were incorrect because Bartley told him so").

---

[9] Document No. 106 at 7-15.

Defendants rely on several patent cases in which expert testimony was excluded based in part on differences between the technologies at issue and those involved in the licenses on which the expert relied for comparison, but those cases do not compel exclusion here under the very different facts of this trademark dispute. *Cf.* LaserDynamics, Inc. v. Quanta Computer, Inc., 694 F.3d 51, 81 (Fed. Cir. 2012) ("In sum, the 6% royalty rate was untethered from the patented technology at issue and the many licenses thereto and, as such, was arbitrary and speculative."); DataQuill Ltd. v. High Tech Computer Corp., 887 F. Supp. 2d 999, 1024 (S.D. Cal. 2011) ("[F]or [the expert's] analysis to be sound, he would have to show that these two categories of licenses--which would appear to be essentially two worldwide licenses between HTC and multiple technology companies covering thousands of patents-- are economically comparable to the license at issue in this case, a domestic license for two patents."); M2M Sols. LLC v. Enfora, Inc., 167 F. Supp. 3d 665, 677-78 (D. Del. 2016) ("These loose, vague allegations of technological comparability, without any explanation, are insufficient, and do not even provide a basis to meaningfully assess technological comparability."). Nor do Defendants suggest that Salters ignored better evidence of more similar licenses in favor of dissimilar ones. *Cf.* LaserDynamics, 694 F.3d at 80 ("Mr. Murtha's 6% running royalty theory cannot be reconciled with the actual licensing evidence, which is highly

10

probative of the patented invention's economic value in the marketplace, and of the form that a hypothetical license agreement would likely have taken."). Instead, the thrust of Defendants' argument seems to be that because Plaintiff has not previously licensed a variation of its trademark under circumstances nearly identical to this case, it is impossible to calculate a reasonable royalty if Defendants are found to have infringed.[10] It does not appear that the caselaw requires such exactitude or precludes an expert on the subject in a case such as this from considering, based on the facts that are established, a reasonable royalty as one of the recognized damages remedies.

Defendants are free to argue, and the jury may well conclude, that the differences between the transactions Salters considered and the facts of this case undermine her conclusions. But Defendants' contentions go to the weight to be given to Salters's opinion testimony, not its admissibility, and should be explored on

---

[10] Defendants are correct that "[u]sually, when the courts have awarded a royalty for past acts of infringement, it was for continued use of a mark after a license ended and damages were measured by the royalty rate the parties had agreed on." Streamline, 851 F.3d at 459 (citation omitted). Such circumstances certainly facilitate the calculation of a reasonable royalty, but the Fifth Circuit has not limited the award of royalties to situations where the infringing party had an expired license. See id. at 461 (vacating a royalty award that did not bear a rational relationship to the infringing use, and hence concluding that "we need not address whether a royalty-based award can be based on a hypothetical negotiation between the parties").

cross-examination rather than by excluding Salters's testimony. <u>Daubert</u>, 113 S. Ct. at 2798; <u>Viterbo</u>, 826 F.2d at 422.

Defendants' second argument is that Salters's royalty opinion should be excluded because it is not "rationally related to the scope of the defendant's infringement" as required by <u>Streamline</u>, 851 F.3d at 461. In <u>Streamline</u>, the Fifth Circuit did not address the admissibility of the expert's testimony but rather evaluated whether the jury's award was adequately supported by evidence. Defendants' arguments about the dissimilarity of its "Oportun" name and Plaintiff's "Opportune" mark and differences in the scope of their use highlight fact issues for the jury to consider in evaluating the weight to give Salters's opinions, but Defendants have not shown that <u>Streamline</u> requires the exclusion of those opinions.

In <u>Georgia-Pacific Corp. v. U.S. Plywood Corp.</u>, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), the court identified 15 factors that are frequently used for "the determination of the amount of a reasonable royalty for a patent license." Relying solely on cases involving patent infringement, Defendants next argue that Salters's royalty opinions must be excluded because they are not based on the 15 <u>Georgia-Pacific</u> factors. Many of these factors, including "[t]he duration of the patent," "[t]he utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results," and "[t]he established

12

profitability of the product made under the patent; its commercial success; and its current popularity," are plainly inapplicable in trademark cases, and Defendants cite no authority requiring their use to support an opinion on reasonable trademark royalties. Indeed, even in patent cases, the Federal Circuit has explained that "[w]e do not require that witnesses use any or all of the Georgia-Pacific factors when testifying about damages." Whitserve, LLC v. Computer Packages, Inc., 694 F.3d 10, 31 (Fed. Cir. 2012). Salters's opinion does reference Georgia-Pacific and some of its factors in her report,[11] but Defendants have not shown that any deficiencies in her analysis of those factors mandate exclusion of her royalty opinion.

Defendants' fourth challenge to Salters's royalty opinion is that Salters improperly applied a 1% royalty rate to all of Defendants' revenues rather than only to the revenues that are rationally related to Defendants' infringement. Defendants rely on Holiday Inns, Inc. v. Airport Holiday Corp., 493 F. Supp. 1025, 1028 (N.D. Tex. 1980), in which the court reduced a requested royalty award because "[s]eventy per cent of room sales were due to [the defendants' employee's] efforts and only thirty per cent due to potential patrons of Plaintiff's licensees seeing Defendants' motel with the infringing and unfair use of Plaintiff's marks." The court in Holiday Inns did not discuss, much less exclude, any

---

[11] Document No. 107, ex. 1 ¶ 33.

13

expert testimony.  Here, Salters explained in her deposition why she chose and applied the royalty rate as she did,[12] and Defendants disagree with her conclusion.  This disagreement is best addressed through cross-examination and resolution by the jury rather than through exclusion of Salters's opinion.  <u>Daubert</u>, 113 S. Ct. at 2798; <u>Viterbo</u>, 826 F.2d at 422.

Finally, Defendants argue that Salters's opinion should be excluded because she never attempted to quantify Plaintiff's actual damages so as to confirm that her suggested royalty award would not result in a windfall to Plaintiff.  Defendants argue that because Plaintiff's actual damages are zero, no royalties can be awarded.  <u>See</u> 15 U.S.C. § 1117(a) ("In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount.").  As Plaintiff correctly argues, though, a royalty fee is itself an award of actual damages, as the Fifth Circuit has "permitted trademark infringement damages on the basis of the royalty rate normally charged for licensing the unauthorized use of the mark, on the logic that the plaintiff sustained damages equal to the profit they could have made from such a license." <u>Streamline</u>, 851 F.3d at 459.  Although such an award is rare in the absence of a prior licensing agreement between the parties, the Fifth Circuit has not precluded it, and Defendants cite no

---

[12] Document No. 116, ex. B at 133:6-134:17.

authority requiring separate proof of actual damages before a royalty fee can be awarded. Accordingly, Defendants have not established that Salters's royalty opinions should be excluded.

### 3. ACPA Statutory Damages

Salters in her report observes that the ACPA provides for statutory damages of between $1,000 and $100,000 per domain name and that Plaintiff contends that Defendants have registered 185 domain names in bad faith, such that "[t]otal statutory damages owed by the Defendants to Opportune range from $185,000 to $18.5 million."[13] Salters offers no opinion as to what amount of statutory damages within that range should be awarded, and she appears to include the information about the ACPA damages only to give the jury a complete picture of the total damages that may be awarded on Plaintiff's various claims. Defendants do not dispute any of Salters's statements about statutory damages, but they argue that they must be excluded as irrelevant and unhelpful to the jury. It is unclear how Defendants will be harmed by Salters's accurate recitation of the range of possible statutory damages, but Defendants are correct that it is the role of the Court and not expert witnesses to instruct the jury on the law. Accordingly, and because Plaintiff makes no argument as to why they are useful to

---

[13] Document No. 107, ex. 1 ¶ 42.

15

the jury, Salters's statements about statutory damages under the ACPA are excluded.

B.   Opinions of Jason McDonald

Jason McDonald in his expert report offers opinions on digital marketing and advertising, including search engine optimization, search engine marketing and advertising, and social media marketing.[14]  McDonald earned a B.A. from Harvard University and a Ph.D. from the University of California, Berkeley, and has decades of experience as a company founder, author, teacher, consultant, and expert witness in the field of search engine optimization and digital marketing.[15]   Defendants do not dispute McDonald's qualifications, but they argue that certain of his opinions should be excluded because (1) McDonald opines on ultimate legal conclusions, (2) his opinions are speculative and unreliable, and (3) his opinions about injunctions and algorithm confusion are irrelevant and not helpful to the jury.[16]

McDonald's report includes a statement that "based on the evidence presented to me, as well as additional evidence I uncovered through research and my professional experience as an expert in SEO, SEM, and SMM, it is my professional opinion that

---

[14] Document No. 107, ex. 2.

[15] Id., ex. 2 at 3-4.

[16] Document No. 106 at 19-24.

Defendant's digital marketing and advertising have and will continue to create considerable online confusion surrounding the term 'Opportune' and related terms, both in advertising and in organic results."[17]  In its Order entered March 12, 2020, the Court excluded the conclusory opinion of Defendants' marketing expert Thomas Maronick that there is "no chance that the marketing of the parties' services could lead the parties' respective reasonable customers to confuse [the two trademarks]" because Maronick's conclusion "crosses the line into an ultimate legal conclusion."[18] Relying on this ruling, Defendants argue that McDonald's statement quoted above (and several others like it) is likewise an ultimate legal conclusion that must be excluded.  Although closely related to the ultimate legal question of whether Defendants' use of the "Oportun" mark is likely to cause customer confusion, McDonald's statement is not itself an ultimate legal conclusion but rather a summary of his extensive explanation of how search engines and online advertising work and why, based on his experience and review of the evidence, he believes that Defendants' advertising choices already have and will continue to cause their "Oportun" mark to be associated with Plaintiff's "Opportune" mark.[19]  McDonald's opinion

---

[17] Document No. 107, ex. 2 at 7-8.

[18] Document No. 105 at 7.

[19] Similarly, although Maronick's absolute statement that there is "no chance" of consumer confusion, or that such is in effect impossible, goes beyond the scope of permissible expert opinion, nothing in the Court's March 12, 2020 Order precludes Maronick from

about confusion is not an improper legal conclusion.  *See* FED. R.
EVID. 704(a) ("An opinion is not objectionable just because it
embraces an ultimate issue.").

Defendants also challenge as a legal conclusion McDonald's
statement that "Defendant is pro-actively conflating the two words
and encouraging confusion by both users and search engines to the
effect that the two words are, for all intents and purposes,
equivalent."[20]  In context, this statement is not an opinion on the
wilfulness of Defendants' alleged infringement, but rather part of
McDonald's explanation that Defendants' choices to purchase
advertisement keyword triggers for "Oportun" and "Opportune" have
caused those terms to become increasingly associated with one
another in the search engine.  This opinion is not an impermissible
legal conclusion.

Defendants' second argument is that McDonald's opinions on the
cause of the misdirected customer communications Plaintiff has
received and on the role of Defendants' radio advertisements are
speculative and unreliable.  *See* Paz v. Brush Engineered Materials,
Inc., 555 F.3d 383, 388 (5th Cir. 2009) (expert testimony must be
"more than subjective belief or unsupported speculation") (quoting
Daubert, 113 S. Ct. at 2795).  McDonald conceded in his deposition

---

explaining at trial why he believes that the differences between
the parties' services, markets, customers, and advertising prac-
tices in his expert opinion make consumer confusion unlikely.

[20] Document No. 107, ex. 2 at 41.

that he did not know what caused any particular phone call or email to be misdirected to Plaintiff and that his opinions as to those communications were speculative.[21]   Thus, to the extent McDonald purports to opine that any particular misdirected communication was caused by Defendants' online advertising practices, his speculative opinion is excluded.   However, his opinion that Defendants' offline advertising reinforces the online conflation between the terms "Opportune" and "Oportun" is based on Defendants' expert's testimony that radio advertising drives traffic to the internet and is proper opinion testimony within the scope of McDonald's expertise.

McDonald also opines that "unless Defendant is prohibited from digital advertising, it is my professional opinion that there is no way to effectively remedy the online confusion and association between Plaintiff's trademark 'Opportune' and Defendant 'Oportun.'"[22]   Defendants argue that this opinion must be excluded as irrelevant and not helpful to the jury because the issuance of an injunction is a legal issue reserved for the Court, not the jury.   In context, McDonald's opinion is an explanation of the extent and irreversibility of the online confusion between the parties' marks--a proper subject of his expert testimony--and not

---

[21] Id., ex. 8 at 145:6-21, 154:19-155:6.

[22] Id., ex. 2 at 53; see also id., ex. 2 at 65.

a recommendation that the jury impose an injunction.  As such, it is not irrelevant.

Finally, Defendants argue that "McDonald's opinions should be excluded as irrelevant and not helpful to the jury to the extent his opinions concern AI or algorithm confusion--not confusion by an actual consumer--because the Lanham Act does not protect infringement which confuses algorithms or AI."[23]  Defendants are correct that Plaintiff to prevail on its claims will have to show consumer confusion and that much (but not all) of McDonald's report involves confusion of search engine algorithms.  But it does not follow that algorithm confusion is irrelevant to consumer confusion.  A jury may reasonably conclude that the association created on search engines between the parties' marks, such that a consumer searching for "Opportune" may be redirected to Defendants' website, contributes to the likelihood of consumer confusion.  Accordingly, Defendants have not shown that McDonald's testimony should be excluded as irrelevant.

## IV. Order

For the foregoing reasons, it is

ORDERED that Defendants' Motion to Exclude Opinions and Testimony of Ambreen Salters, Ph.D. and Jason McDonald, Ph.D. (Document No. 106) is GRANTED IN PART as follows:  Ambreen

---

[23] Document No. 106 at 23.

Salters's statements about the statutory damages available under the Anti-Cybersquatting Consumer Protection Act and Jason McDonald's speculative opinions that any particular misdirected communication received by Plaintiff was caused by Defendants' online advertising practices are EXCLUDED.  Defendants' motion is otherwise DENIED.

The Clerk will enter this Order, providing a correct copy to all parties of record.

SIGNED at Houston, Texas, on this 29ᵗʰ day of March, 2020.

EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE

21